# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.:  20-2844

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

                        Plaintiff,

v.

MILTON J. DOSAL, JR.,

                        Defendant.

## COMPLAINT AND JURY DEMAND

Plaintiff, United States Securities and Exchange Commission (the "SEC"), alleges as follows against Defendant Milton J. Dosal, Jr. ("Dosal" or "Defendant"):

### SUMMARY

1. This civil action concerns a Ponzi scheme and misappropriation perpetrated by Milton J. Dosal, Jr. that targeted U.S. military service members and others.

2. From approximately December 2017 through February 2019 (the "Relevant Period"), Dosal obtained nearly $98,000 from approximately 41 investors, about a quarter of whom were cadets at the United States Air Force Academy ("AFA"), under the guise that he would day-trade stocks on their behalf.

3. Dosal has never held any securities licenses, but held himself out as a stock broker and executed fake stock broker agreements for some of the investors.

4. Rather than trading stocks, Dosal used most of the investor funds to pay back prior investors and for personal expenses, including gambling and jewelry. Indeed, for most of the Relevant Period Dosal did not trade any securities at all.

5. Dosal furthered and covered up his fraud by making Ponzi payments (i.e., using new investor funds to make payments owed to other investors) and by making false statements to investors about his trading activity and their investment returns.

6. Many of Dosal's investors have suffered losses due to his fraud.

7. As a result of the conduct described herein, Dosal violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §77q(a)] and Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8. The SEC seeks permanent injunctions against Defendant, enjoining him from future violations of the securities laws, disgorgement of all Defendant's ill-gotten gains from the unlawful activity set forth in this Complaint, together with prejudgment interest, and civil penalties against Defendant under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and such other relief that the Court may deem appropriate.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10. Defendant, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

11. Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1391(b). Defendant resides in this district. In addition, many of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this district.

## DEFENDANT

12. **Milton J. Dosal, Jr.**, age 29, is a resident of Brighton, Colorado. Despite holding himself out as a day-trader and stock broker, Dosal has never held a securities license or been registered with the SEC in any capacity. Rather, Dosal is employed as a home appliance installer.

## FACTS

### I. Background and Overview

13. Around January 2017, Dosal opened an account at a U.S.-based brokerage firm ("Company A") and began trading stocks for himself. Through 2017, he traded $21,658 worth of stocks, most of them penny stocks, and generated profits of $120.

14. Notwithstanding his short and unremarkable history of trading, around December 2017, Dosal began soliciting and accepting funds from individuals to day-trade stocks on their behalf.

15. Between approximately December 2017 and mid-May 2018, Dosal obtained approximately $22,000 from investors. Dosal received those funds into his own bank account, commingled them with his personal income, and used little of these early investor funds for trading. Indeed, he transferred substantially less funds than he received from investors to his brokerage account at Company A.

16. By May 18, 2018, Dosal had lost $17,060 from his trading activities and he stopped trading because of his poor results.

17. In June 2018, Dosal withdrew the remaining funds from his trading account at Company A, leaving an account balance that was near zero.

18. Though Dosal stopped trading securities in May 2018, he continued to solicit investor funds by making similar representations to prospective investors about his intent to day-trade stocks. None of the funds he subsequently received, approximately $76,000, was used to trade stocks. From that point on, Dosal engaged in a pure Ponzi scheme in which he used new investor funds to make payments to prior investors as needed to perpetuate the fraud while misappropriating the remainder.

**II.    Rather than Investing in Stocks, Dosal Misappropriated Investor Funds and Used New Investor Funds to Make Ponzi Payments to Prior Investors**

19. Investor funds that Dosal received were deposited directly into his own bank accounts. Once deposited, Dosal misappropriated the funds for his personal benefit and used them for Ponzi payments.

20. Over the Relevant Period, Dosal used approximately $46,208 of the investor funds (around 48% of the total amount he obtained from investors) to make Ponzi payments to support the illusion that he was generating trading profits.

21.     Dosal used the bulk of the remaining of the funds he obtained for daily living expenses and other clearly personal expenses, such as gambling and jewelry.

### III.    Dosal Made and Disseminated Misrepresentations to Investors To Induce Them to Invest

22.     Dosal is a car enthusiast and he met a number of his investors through car club events.  At one of these events held near Colorado Springs, home of the AFA, Dosal befriended an AFA cadet ("Individual 1").

23.     Around early December 2017, Dosal told Individual 1 that he was a successful day-trader and knowingly made a number of materially false statements to entice him to make an investment.  Those misstatements included, among other things, that: (1) Dosal made approximately $40,000 per month day-trading stock; (2) Dosal used algorithms to guide his trading; (3) Dosal would make Individual 1's "money work for" him; (4) Dosal would split Individual 1's funds among a number of penny stocks; (5) Individual 1's money would be segregated into a separate account at Company A; and (6) Dosal would not charge a commission.

24.     Based on these false representations, Individual 1 invested $5,000 with Dosal.

25.     Thereafter, Dosal told Individual 1 he had profited from his investment.  For example, on December 25, 2017, Dosal sent Individual 1 a screenshot, purportedly from Company A, showing that his $5,000 investment had grown to approximately $11,000.  Dosal's representations to Individual 1 were false as Individual 1's investment had not increased to $11,000 due to Dosal's trading.

26.     Dosal then used his relationship with Individual 1 to gain access to other AFA cadets to persuade them to invest.  In doing so, Dosal typically mentioned his own military service to build a common connection with the military service members he solicited.

27. Dosal also solicited and obtained dozens of non-cadet investors whom he located through, among other things, car shows and referrals.

28. To further enhance his referral network and gain access to more investors, Dosal promised certain investors that he would pay a finders' fee, typically $50 or $75, for each person they referred to him and who invested funds.

29. After Dosal met or was referred to a potential investor, Dosal typically solicited that person through social media messaging or by exchanging text messages.

30. In these written messages, Dosal knowingly made numerous material false statements to induce individuals to invest with him. For example, Dosal falsely stated that he would use the funds provided to him to day-trade securities on behalf of the investor at Company A or another brokerage firm where Dosal purported to (but did not) have an active account. At the time he made these statements, Dosal knew he intended to misappropriate the investor funds and use some or all of the proceeds for his personal benefit.

31. Dosal also told investors that he would not lose their money trading as his trading had been profitable, and that they could expect weekly returns of between five to ten percent. Again, these statements were materially false and Dosal knew it as he had cumulatively lost money trading and was no longer trading stocks.

32. Some examples of Dosal's false written communications to investors after he stopped trading stocks include the following:

    a. On or about January 8, 2019, Dosal sent a social media message to an investor stating: "I basically invest the money you have for you everyday [sic] and keep you up to date on how it's working. I work . . . everyday.

      Nasdaq, nyse, and Dow. I always trade from about 3% to 10% gains to not be greedy and avoid fallback. Sometimes it turns out we get way more."

  b. On or about October 25, 2018, Dosal sent social media messages to an investor stating: "I typically try go for 10 percent a week. . . . . They are all in either nasdaq or nyse. I always have a stop loss so I haven't had a loss greater than 43 dollars in a long time. . . . [T]he way the market has been hasn't really affected me much considering I don't get into the bigger stocks. A lot of the stocks I use are from 1c to 5 or 6 dollars. It hasn't been very high risk."

  c. On or about October 24, 2018, Dosal sent a text message to an investor stating: "So what I do is day trading. Basically what I do for people is take whatever they give me money wise and make money for them."

33. In some of his communications with potential investors, Dosal also held himself out as a securities professional. Dosal even executed a fake "Stock Broker Agreement" with a few of his investors. At the time, Dosal knew he did not work in the securities industry and that he was never licensed as a stock broker.

## IV. Dosal Engaged in Deceptive Conduct to Perpetuate and Conceal His Fraud

34. Once Dosal obtained the initial funds from an investor, he often maintained that investor's confidence and encouraged additional investment by showing quick returns (which were fictitious) or returning some money to the investor (which were, in reality, Ponzi payments).

35. Dosal created the illusion of profitable trading and concealed his misappropriation of funds by knowingly providing investors with false account balances at Company A. Usually this was done by texting/messaging an investor a dollar amount that Dosal supposedly held on his or her behalf at Company A or telling the investor how much their account balance had increased after a supposed trade. These figures were fabricated by Dosal.

36. For example, on October 6, 2018, Dosal sent a social media message to an investor (who had invested $1,000 in September 2018) stating that his brokerage account balance had grown to $1,800. This statement was false as Dosal never transferred any of the investor's funds to a brokerage account.

37. In addition, at times, Dosal altered screen shots of his online account at Company A to reflect fictitious balances showing thousands of dollars (even though his actual Company A account balance was at or near zero at the time) that he then sent to several of his investors.

38. For example, on December 17, 2018, Dosal sent a screen shot of a brokerage account at Company A to an investor (who had invested $3,500 in June 2018) showing a balance of $10,467.91. This document was falsified by Dosal because Dosal never sent any of the investor's funds to Company A and the true balance in that account at the time was less than $1.00.

39. Some of Dosal's investors provided Dosal with additional funds or referred others to him based on these phony returns.

40. Dosal raised approximately $98,000 from 41 investors based on these false and misleading statements detailed above.

41. The misstatements and omissions described above were material as they substantially altered the mix of information presented to Dosal's investors by touching upon the most fundamental aspects of the investment, including: Dosal's use of funds; Dosal's compensation; the profitability of their investment; and the location of their funds. Fundamentally, an investor would consider it important that Dosal was running a Ponzi scheme and misappropriating investor funds.

42. Dosal was unable to obtain enough new money to continue making the Ponzi payments promised to and requested by his investors in early 2019. Dosal then utilized lulling tactics to pacify investors into not reporting the fraud.

43. For example, when Dosal could not pay certain investors, he told them that his inability to do so stemmed from Company A placing a freeze on his account to supposedly investigate his trading activities. As Dosal neither held the investors' funds at Company A nor traded securities for many months, the excuse he provided was false.

V. **Dosal's Misrepresentations Were Made "In the Offer or Sale" and "In Connection with the Purchase or Sale" of Securities**

44. Each of the material misstatements described above that induced investors to send Dosal money were made in the offer or sale of securities as defined in Section 2(a)(1) of the Securities Act and in connection with the purchase or sale of securities as defined in Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78c(a)(10)].

45. In particular, Dosal made the material misstatements described above to induce investors to give him money to buy and sell stocks on their behalf.

46. Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other things, "stock."

## VI. Dosal Acted as an Unregistered Broker

47.     While operating his Ponzi scheme, Dosal acted as a "broker" as defined in Section 3(a)(4)(A) of the Exchange Act [15 U.S.C. 78c(a)(4)(A)].

48.     Dosal obtained nearly $98,000 from 41 investors by offering to day-trade securities on their behalf.

49.     Dosal actively and personally solicited each of the investors, handled their funds, and promised significant and rapid returns.

50.     In some instances, Dosal also held himself out as a securities professional and even executed a "Stock Broker Agreement" with investors.

51.     Dosal has never been registered as, or associated with, a registered broker-dealer. In fact, Dosal has never even worked in the securities industry.

## VII. Unless Enjoined, Dosal Will Continue to Defraud Investors

52.     Dosal's misconduct described above was intentional and egregious, and he victimized a number of people, include U.S. military service members, over a lengthy period of time.

53.     Dosal's young age also creates substantial risk that he will again victimize investors if not enjoined.

**FIRST CLAIM FOR RELIEF**
**Fraud: Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 thereunder**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**

54.     The SEC realleges and incorporates by reference paragraphs 1 through 53, as though fully set forth herein.

55. Defendant, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly and recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

56. By virtue of the foregoing, Defendant, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5] thereunder.

**SECOND CLAIM FOR RELIEF**
**Fraud: Violation of Section 17(a) of the Securities Act**
**[15 U.S.C. § 77q(a)]**

57. The SEC realleges and incorporates by reference paragraphs 1 through 53, as though fully set forth herein.

58. Defendant, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly, recklessly, and negligently: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

11

59. By virtue of the foregoing, Defendant, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)(2)]

### THIRD CLAIM FOR RELIEF
### Failure to Register as Broker-Dealer:
### Violation of Section 15(a) of the Exchange Act
### [15 U.S.C. § 78o(a)]

60. The SEC realleges and incorporates by reference paragraphs 1 through 53, as though fully set forth herein.

61. Defendant, while acting as a broker or dealer, made use of the mails or means and instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities in the form of stock without being registered with the Commission as a broker or dealer or an associated person of a registered broker-dealer.

62. By reason of the foregoing, Defendant has violated and, unless restrained and enjoined, will continue to violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

### RELIEF SOUGHT

**WHEREFORE**, the SEC respectfully requests that this Court:

### I.

Find that the Defendant committed the violations alleged in this Complaint;

### II.

Enter an injunction, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, temporarily, preliminary and, permanently restraining and enjoining Defendant and his agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with him, who receive actual notice of the Final Judgment by personal service or

otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 17(a) of Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

### III.

Order Defendant to disgorge all ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains;

### IV.

Order Defendant to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

### V.

Grant such other and further relief as this Court may deem just and proper.

### JURY DEMAND

The SEC demands a trial by jury on all claims so triable.

Dated: September 21, 2020

*/s/ Nicholas P. Heinke*
Nicholas P. Heinke
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000
HeinkeN@sec.gov
*Counsel for Plaintiff*